THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HARVINDER SINGH, *et al.*,

Plaintiffs,

v.

SORAYA MOTOR CO, *et al.*,

Defendants.

CASE NO. C17-0287-JCC

ORDER

This matter comes before the Court on the Defendants'[1] motion for summary judgment (Dkt. No. 53) and motion to strike material from Plaintiff's response (Dkt. No. 81). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for summary judgment (Dkt. No. 53) and GRANTS in part and DENIES in part the motion to strike (Dkt. No. 81) for the reasons explained herein.

I. **BACKGROUND**

In February 2016, Plaintiff Harvinder Singh ("Singh") bought a new Honda Accord from Defendant Hinshaw's Honda ("Hinshaw's"). (Dkt. No. 62 at 1.) The car had two stickers on the

---

[1] Namely, Soroya Motor Company, Arianna Motor Company, Inc., Hinshaw's Honda, Hinshaw's Acura, Honda of Auburn, Hooman Honda, Hooman Motors Group, Hooman Acura and Hooman Bodaghi. The Court refers to these Defendants as "Dealership Defendants."

window with information about features and costs. (Dkt. No. 71 at 41, 50, 75.) One listed the car's standard features and a Manufacturer's Suggested Retail Price ("MSRP") of $28,670.00. (*Id*. at 50.) The other sticker ("Dealer's Addendum") listed a "dealer price" of $29,505, as well as costs for three items: "3M," "Pro Pak," and "New Car Detail & Dealer Prep" ("Dealer Prep") (collectively "Add-ons"). (*Id*. at 75.) The sticker listed these Add-ons beneath the heading "DEALER-ADDED EQUIPMENT AND SERVICES." (*Id*.) 3M had a listed cost of $199, Pro Pak of $529, and Dealer Prep of $399. (*Id*.) The Dealer's Addendum listed a total price, inclusive of the Add-ons, of $30,632.00. (*Id*.)

Singh did not know what any of the Add-ons were and was never provided a description of them (Dkt. Nos. 62 at 1, 72 at 2.) Nevertheless, he thought the Add-ons would be included as part of the price of the car because they were listed on the Dealer's Addendum. (Dkt. No. 62 at 2.) When Singh completed sales paperwork, the Dealer's Addendum was not included with the paperwork. (*Id*. at 3.) Singh negotiated with dealership employees over the final sale price of the car, but did not separately negotiate the inclusion or price of the Add-ons. (*Id*. at 4.) Before purchasing the car, Singh signed the following documents: (1) a Purchase Order; (2) a Sales Contract; and (3) a Retail Installment Sale Contract ("RISC"). (Dkt. No. 71 at 47, 44–45, 58–60.)

The Purchase Order lists the base price of the car as $27,356.79. (Dkt. No. 71 at 47.) Below the price, under the heading, "Accessories" is written "sold w/ prep & pro pkg (muds, tray, locks)." (*Id*.) The Sales Contract lists the "Base Price of Vehicle and Options" as $27,356.79 (Dkt. No. 71 at 44.) The Sales Contract does not list any Add-ons by name or price. (*Id*.) The RISC lists the total vehicle price, including taxes, licensing and other fees, as well as applicable financing information. (Dkt. No. 71 at 58–60.) The RISC does not list any Add-ons by name or price and lists the total cash price as $27,356.79. (*Id*.)

After buying his car, Singh discovered that it was not equipped with 3M. (Dkt. No. 62 at 4.) Singh learned that Pro Pak referred to the mud flaps, wheel locks and trunk tray included with the car. (*Id*.; Dkt. No. 71 at 66, 81.) Singh also found out that Dealer prep refers to a pre-delivery

cleaning of the car by the Dealership. (Dkt. Nos. 62 at 4, 71 at 67.)

Singh brings a putative class action, alleging that Dealership Defendants fail to disclose the cost of, and in some cases fail to furnish, Add-ons during the sale and lease of new cars. (*See generally* Dkt. No. 42.) Singh alleges that Dealership Defendants breached their contract, violated a duty of good faith and fair dealing, negligently supervised employees, violated the Washington Consumer Protection Act ("CPA"), Revised Code of Washington § 19.86 *et seq.*, and violated the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601., *et seq.* (*Id*. at 34–41.)

## II. DISCUSSION

### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

District courts have discretion to rule on motions for summary judgment prior to addressing the issue of class certification. *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984). The requirement of Federal Rule of Civil Procedure 23(c) that class certification be made "as

soon as practicable" is not absolute, and "it is reasonable to consider a Rule 56 motion first when early resolution of a motion for summary judgment seems likely to protect both parties and the court from needless and costly future litigation. *Id*. (citation omitted.) A defendant who moves for summary judgment prior to class certification accepts the risk that a favorable ruling would not preclude the claims of absent class members. *Id*.

In this case, the Court finds that it is appropriate to consider Dealership Defendants' motion for summary judgment prior to ruling on class certification. First, by bringing a motion on the merits, Dealership Defendants assume the risk that a favorable ruling would only work against Singh's claims and not bind other potential class members. Neither party has objected to the Court's consideration of the motion prior to class certification. Second, the Court believes that a ruling on the merits of Singh's claims can avoid the costs of class certification.

### B. Dealerships' Motion to Strike

In its reply brief, Dealership Defendants ask the Court to strike several declarations from Singh's response brief because they contain legal argument meant to skirt the page limits. (Dkt. No. 81 at 15.) Declarations are not the place for legal argument. *See King Cty. v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002) (citing to Federal Rule of Civil Procedure 56(c)) The Court finds that the declaration provided by Singh's counsel with his first response to summary judgment contains legal argument that should have been contained in his response. (Dkt. No. 60 at 2–22.) The Court therefore STRIKES pages 2–22 from Docket Number 60.

Dealership Defendants additionally ask the Court to strike the declarations of Ruhul Kayshel and Lewis Linet because they contain improper legal argument and lack foundation. (Dkt. No. 81 at 15.) These objections are not specific enough to merit striking the declarations in their entirety, and the Court will not parse the declarations to determine what testimony is or is not admissible. (*See generally* Dkt. Nos. 61, 71.) The Court will only strike testimony or evidence if it is clear from the record that it could not be admissible at trial. Based on the above findings, Dealership Defendant's motion to strike is GRANTED in part and DENIED in part.

**C.     Singh's Claims Against Dealership Defendants**

Singh asserts five causes of action against Dealership Defendants: (1) Breach of contract; (2) Violation of the duty of good faith and fair dealing; (3) Negligent Supervision; (4) Violation of the CPA; (5) Violation of TILA. (Dkt. No. 42, at 34–41.)

1. <u>Breach of Contract</u>

Under Washington law, a breach of contract claim requires: "(1) a contract that imposed a duty, (2) breach of that duty, and (3) an economic loss as a result of that duty." *Muniz v. Microsoft Corp.*, No. C10-0717-JCC, slip op. at 3 (W.D. Wash. Oct. 29, 2010) (citing *Myers v. State*, 218 P.3d 241, 243 (Wash. Ct. App. 2009)). To make out a claim, the plaintiff must be able to point to a specific provision of the contract that was breached. *Id.* (citing *Elliot Bay Seafoods, Inc. v. Port of Seattle*, 98 P.3d 491, 494 (Wash. Ct. App. 2004)).

Dealership Defendants argue that Singh cannot point to specific provisions of the contract that they breached. (Dkt. No. 81 at 5.) Defendants assert that Singh received everything he was promised under the contract—that "the contract was for the sale of a certain vehicle at a certain price" and no items or costs were added to the total price that Singh negotiated and agreed to pay. (*Id.* at 1–2, 4.)

Singh asserts that the contract to purchase his car was "composed of, the Sales Contract . . . RISC . . . and possibly the Vehicle Purchase Order." (Dkt. No. 69 at 15.) Singh signed each of these documents prior to the sale, and each contains terms regarding the purchase of the new car. (Dkt. Nos. 71 at 44–45, 47, 58–60.) The evidence shows that the Dealer Addendum attached to Singh's car did not make up part of the contract because that sticker's terms, were not incorporated into the parties' negotiation, never signed by the parties, and not part of the final deal-file that memorialized the sale. (Dkt. Nos. 62 at 3, 71 at 6–7, 48, 75.) Nor did the information on the Dealer Addendum reflect the terms that Singh and the Dealership ultimately negotiated and agreed to in the Purchase Order, Sales Contract, and RISC. (Dkt No. 71 at 44–45, 47, 58–60, 75.)

Curiously, Singh's theories of breach all proceed as if the terms contained in the Dealer Addendum and other Dealership documents were part of the contract. (Dkt. No. 69 at 16.) Singh alleges the Dealership "charged [him] $399 for 'NEW CAR DETAIL & DEALER PREP.'" (Dkt. No. 69 at 16.) However, the only reference to that price is on the Dealer's Addendum. (Dkt. No. 71 at 75.) An internal Dealership invoice shows that Singh's car received "New Car Detail" at a cost of $65.00, but that service was disclosed as "prep" on the Purchase Order and included as part of the negotiated base price of the vehicle. (Dkt. No. 71 at 42, 47.)

Singh states that the Dealership "charged [him] for 'Pro Pak' but they did not furnish the All-Weather Floor Mats that form a part of the 'Protection Package II' as described in the Dealership's 'ACCESSORIES 2016' form." (Dkt. No. 69 at 16.) Items included in a "Protection Package II" were never promised to Singh, nor listed in the contract documents. (Dkt. No. 71 at 47.) The Purchase Order notes that the car was sold with "pro pkg (mud, tray, locks)" and an internal Dealership invoice shows Singh's car received those items at a cost of $561.50. (Dkt. Nos. 71 at 43, 47.) That cost was included as part of the negotiated base price that Singh agreed to pay in the Purchase Order. (*Id.* at 47.)

Singh states that the Dealership "charged [him] for '3M' as shown on the Small Sticker, but they did not furnish it." (Dkt. No. 69 at 16.) The small sticker, or Dealer's Addendum, was not part of the contract between the parties, and 3M is not referenced anywhere in the contract documents. (Dkt. Nos. 71 at 44–45, 47, 58–60.) There is no evidence that the price Singh paid for the car included a charge for 3M; in fact, internal Dealership paperwork shows that 3M was not included as part of the base price of the car. (Dkt. No. 71 at 63.)

Singh additionally argues that the Dealership committed a per se breach of contract by not complying with the terms of the Auto Dealer's Practices Act, Revised Code of Washington 46.70.130 ("ADPA"). (Dkt. No. 69 at 16–17.) That law provides:

> (1) Before the execution of a contract or chattel mortgage or the consummation of the sale or lease of any vehicle, the seller must furnish the buyer or lessee an itemization in writing signed by the seller separately disclosing to the buyer or

> lessee the finance charge, insurance costs, taxes, and other charges which are paid
> or to be paid by the buyer or lessee.

Wash. Rev. Code § 46.70.130(1). Singh argues that the Dealership violated this provision by not including the price of Add-ons in the Sales Contract and RISC. (Dkt. No. 69 at 17.)

Singh offers no legal authority for his assertion that a violation of the ADPA represents a per se breach of contract. Even if the Court were to assume, *arguendo*, that the Dealership's failure to itemize the Add-ons could represent a per se breach of contract, the Court does not find that the items Singh received with his car represent "other charges which are paid or to be paid by the buyer." Wash. Rev. Code § 46.70.130(1).

Singh negotiated a final base price of $27,356.79 which included the Dealer Prep service and Protection Package items noted on the Purchase Order. (Dkt. No. 71 at 47.) To be sure, there are costs associated with these services and products, as is shown from the internal invoices recording the cost to the Dealership of New Car Detail and Protection Package. (Dkt. No. 71 at 42–43.) These costs were incurred by the Dealership as part of the sale and included as part of the negotiated base price. (*Id*. at 47). A car dealership incurs numerous costs when it sells a new vehicle—for example, the fuel consumed during test drives and the commission paid to its sales employees.[2] None can be fairly characterized as "other charges which are paid or to be paid by the buyer." Wash. Rev. Code § 46.70.130(1).[3] If that were the case, then car dealerships would have to disclose myriad information regarding their internal costs, all of which could be viewed as charges that are ultimately paid by the buyer as part of the price of the car.

The Court also finds it inaccurate to characterize these Dealership costs as "other charges" where Singh negotiated a base price that was $2,148.21 less than the dealer price listed on the Dealer's Addendum—a price that did not even account for the $1,127 advertised price of

---

[2] In fact, Hinshaw's internal paperwork notes the cost of gas expended on Singh's car and the amount of commission received by the sales person. (Dkt. Nos. 71 at 52, 54.)

[3] Those costs can be compared, for example, with the documentary service fee of $150.00 and administrative fee of $2.50 which were disclosed in the RISC and which represent "other charges" paid by the buyer as part of the sale process. (Dkt. No. 71 at 59.)

the Add-ons. (Dkt. No. 71 at 75.) Indeed, the costs of New Car Detail and Pro Package as listed on the Dealer's Addendum—$399 and $529 respectively—were effectively reduced to zero by the parties' negotiated base price. (*Compare* Dkt. No. 71 at 75, *with* Dkt. No. 71 at 47.) The Court does not find that Dealership Defendants failure to itemize the individual costs of the Add-ons represents a per se breach of contract.

For the above reasons, the Court finds that Singh has not provided sufficient evidence that Dealership Defendants breached the contract. The Court GRANTS summary judgment for Dealership Defendants on Singh's breach of contract claim.

2. Duty of Good Faith and Fair Dealing

In every contract there is an implied duty of good faith and fair dealing that requires parties to cooperate with one another to realize the benefits of full performance. *See Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014). This duty only exists in regard to the contractual terms agreed to by the parties. *Johnson v. Yousoofian*, 930 P.2d 921 (Wash. Ct. App. 1996) ("The implied duty of good faith is derivative, in that it applies to the performance of specific contract obligations. If there is no contractual duty, there is nothing that must be performed in good faith.") (citation omitted).

Dealership Defendants' argument regarding Singh's duty of good faith and fair dealing claim is the same as its argument regarding his breach of contract claim—Singh cannot point to a specific contractual obligation that Hinshaw's failed to perform in good faith. (Dkt. No. 81 at 9.) The Court agrees. Singh states that the failure of Dealership Defendants to include an itemization of Add-ons in the contract paperwork represented a violation of the ADPA and by extension a violation of duty of good faith and fair dealing. (Dkt. No. 69 at 17.) As the Court held above, the ADPA did not require the Dealership Defendants to disclose the cost of the Add-ons Singh received as part of the base price of his car. *See supra*, Part II.C.1.

Therefore, the Court GRANTS Dealership Defendant's motion for summary judgment on Singh's duty of good faith and fair dealing claim.

### 3. Negligent Supervision

The tort of negligent supervision places a limited duty on employers to control their employees for the protection of third parties. *See Niece v. Elmview Group Home*, 929 P.2d 420, 427 (Wash. 1997). A claim of negligent supervision requires that: (1) An employee acted outside the scope of employment; (2) the employee posed a risk of harm; (3) the employer knew or should have known that the employee posed a risk to others; and (4) the employer's failure to supervise was a proximate cause of loss. *Garrison v. Sagepoint Fin., Inc.*, 345 P.3d 792, 801, *review denied*, 352 P.3d 188 (Wash. Ct. App. 2015) (citation omitted).

Dealership Defendants argue that Singh has not sufficiently alleged or provided evidence that their employees acted outside the scope of their employment when selling Singh's car. (Dkt. No. 81 at 11.) They argue that Singh "offers no evidence for the proposition that allegedly including aftermarket products in a vehicle sale was somehow outside the scope of the employment of the people who sold him his car." (*Id.*)

Under Washington law, "an employee's conduct will be outside the scope of employment if it "is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Robel v. Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002) (citing Restatement (Second) of Agency § 228(2) (1958)). Singh asserts that the "management's deceptive acts against consumers were unquestionably outside the scope of employment, e.g. deception and fraud in charging twice for New Car Detail and for non-furnished 3M and Pro Pak." (Dkt. No. 69 at 22.)

Singh's assertion that the Dealership employees acted outside the scope of their employment is not supported by the record. According to the sales consultant who sold Singh his car "nobody at Hinshaw's Honda went through every item on the MSRP sticker and Dealer's Addendum with customers." (*Id.*) The general manager of Hinshaw's Honda testified that it was the Dealership's practice not to list accessories on the sales contract. (Dkt. No. 74-1 at 102–104.) In other words, the acts Singh complains of were the Dealership's explicit policies and practices.

Singh's expert provides testimony about how the Dealership employees did not act in line with industry standards. (Dkt. No. 71 at 17–24.) But such standards have nothing to do with the fact that Dealership employees were expressly authorized to act in this manner and did so to benefit the Dealership. *See Robel* 59 P.3d at 621; (Dkt. No. 61 at 9.) Thus, Singh has not created a genuine dispute of material fact about whether the Dealership employees acted outside the scope of their employment. Therefore, the Court GRANTS Dealership Defendant's motion for summary judgment on Singh's negligent supervision claim.

### 4. Consumer Protection Act ("CPA")

To state a claim for a violation of the CPA, a plaintiff must allege: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) which impacts the public interest; and (4) an injury to business or property; (5) which was caused by the deceptive act or practice. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986). "The failure to establish any of the elements is fatal to a CPA claim." *Johnson v. Camp Auto., Inc.*, 199 P.3d 491, 493 (Wash. Ct. App. 2009).

Dealership Defendants argue that summary judgment is appropriate because Singh has not demonstrated the Dealership committed deceptive or unfair practices in selling him his car or that he suffered damages as a result of the purchase. (Dkt. No. 81 at 9–10, 12–13.) Singh asserts that the Dealership Defendants committed per se unfair trade practices because it violated two statutes—the ADPA and Revised Code of Washington 46.70.180. (Dkt. No. 69 at 18–19.) Similar to his breach of contract theory, Singh argues that the Dealership Defendants violated the ADPA when they failed to itemize the cost of Add-ons that came with his car. (*Id*. at 18.) The Court has already ruled that the costs of the Add-ons in this case, as a matter of law, were not "other charges which are paid or to be paid by the buyer," that are required to be itemized. *See supra* Part II.C.1. Therefore, Singh's theory that the Dealership Defendants violated the CPA by breaching ADAP is not actionable.

Singh next asserts that the Defendant Dealerships violated a statute that makes it

unlawful for auto dealerships "[t]o cause or permit to be advertised, printed, displayed . . . or disseminated in any manner whatsoever, any statement or representation with regard to the sale, lease, or financing of a vehicle which is false, deceptive, or misleading . . . ." Wash. Rev. Code § 46.70.180(1); (Dkt. No. 69 at 19.) Singh asserts the Dealer's Addendum on his car was deceptive because it advertised that the car was equipped with Add-ons that it did not actually include. (Dkt. No. 69 at 19.)

Even if the Court were to find that the Dealer's Addendum was deceptive or misleading about what Add-ons came with the car, Singh has not offered sufficient evidence for a rational trier of fact to find that the information in the Dealer's Addendum caused him to be injured. The final purchase price Singh negotiated, $27,356.79, was more than $3,000 less than the advertised price of the car with Add-ons, $30,632.00. (Dkt. No. 71 at 47, 75.) Singh's negotiated price was over $1,500 less than MSRP which did not include the cost of any Add-ons. (*Id*.) Internal dealership documents show that Hinshaw's Honda purchased the car sold to Singh for $27,433.94—$77.15 more than the purchase price he negotiated. (Dkt No. 71 at 13, 52.) Singh was aware of the costs advertised on the Dealer's Addendum, and the final price he negotiated effectively reduced those costs to zero. (Dkt. Nos. 62 at 1, 71 at 47.) Although the parties dispute whether Singh's car included the 3M product (*Compare* Dkt. No. 62 at 4, with Dkt. No. 71 at 82), internal Dealership paperwork shows that he was not charged for 3M. (Dkt. No. 71 at 63.) Nor was 3M included as part of the parties' contract. (Dkt. No. 71 at 44–45, 47, 58–60.)

Singh's theory of damages is that if he would have been told the exact cost of the Add-ons—in other words the Dealership's costs for the Add-ons—he would have negotiated an even lower price for the car. (Dkt. No. 69 at 21.) Singh argues that "[his] ability to negotiate a lower price does not mean he was not charged for the add-on products. A jury could determine that the savings from a negotiated reduction is attributed to a lower profit for the dealership rather than a reduction in the cost of the individual add-ons." (*Id.* at 20.) Singh's expert provides extensive testimony about auto dealership profit margins, and how Singh could have negotiated a lower

price if he had more information about the cost of Add-ons. (Dkt. No. 71 at 10–16.)

Singh's theory of damages is entirely speculative. Damages must be proved with reasonable certainty or supported by competent evidence in the record. *Hyde v. Wellpinit Sch. Dist. No. 49*, 648 P.2d 892, 895 (Wash. Ct. App. 1982) (citation omitted). The Court is not aware of any requirement that auto dealerships, or any business, disclose their internal costs to consumers in order to allow them to negotiate lower sale prices. Nor are they required to explain how they came up with the prices they advertise to consumers. *See Blessing v. Sirius XM Radio Inc.*, 775 F.Supp.2d 650, 657–58 (S.D.N.Y. 2011) (business not required to disclose to consumers how it calculated its royalty fee). Here, Singh negotiated and agreed to a price that was thousands of dollars less than the advertised price in the Dealer's Addendum. (Dkt. No. 71 at 47, 75.) Therefore, the Court does not find that the information advertised in the Dealer's Addendum caused him to be injured.

For those reasons, the Court finds that Singh has not produced sufficient evidence to support his CPA claim, and GRANTS summary judgment to the Dealership Defendants.

        5.    Truth in Lending Act ("TILA")

Congress enacted TILA "to assure the meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). As part of consumer credit transactions, creditors must disclose the "amount financed" which is "the amount of credit of which the consumer has actual use." 15 U.S.C. § 1638(a)(2)(A). In addition, creditors must itemize and provide descriptions of the "amount financed." *Id*. at (1)(B), (8). Dealership Defendants assert that summary judgment is appropriate because the financing disclosures contained in the RISC complied with TILA's requirements. (Dkt. No. 81 at 11.) Singh asserts that the Dealership Defendants failed to properly disclose the price and description of Add-ons in the RISC. (Dkt. No. 69 at 24–25.)

The undisputed evidence demonstrates that the Dealership Defendants complied with

TILA's disclosure requirements. Section 1 of the RISC lists the total cash price of Singh's car as $27,356.79, which is the base price negotiated and agreed to by the parties as reflected in the Purchase Order and Sales Contract. (Dkt. Nos. 71 at 44–45, 47, 58.) It is undisputed that Singh received that amount of financing in order to purchase the car. Singh argues that Dealership Defendants are "liable, here, for charging [him] for 3M, Pro Pak and New Car Detail that were not 'defined for [him] by the dealer'" (Dkt. No. 69 at 24) (quoting *Gibson v. LTD, Inc.*, 434 F.3d 275, 285 (4th Cir. 2006)) As the Court has already noted, Singh was not charged for the Add-ons listed on the Dealer's Addendum, as those items were not part of his contract, and he negotiated a base price below the MSRP without the price of Add-ons. *See supra*, Part II.C.1 and 4. Because Singh was not charged for those Add-ons, TILA does not require that they be itemized or described in the RISC as part of the amount financed. *See* 15 U.S.C. § 1638(a)(2)(A)(ii).

Singh's citation to the *Gibson* case is unpersuasive because its facts are distinguishable. In *Gibson*, the Fourth Circuit Court of Appeals upheld a district court's ruling that an auto dealership violated TILA when it failed to disclose a $499 charge for an aftermarket product in a Retail Sales Installment Contract during the sale of a new truck. 434 F.3d at 277–78. In that case, however, it was undisputed that the buyer explicitly told the sales person he did not want the aftermarket product included with his purchase. *Id*. at 277. The dealership ignored the buyer's wishes, and included the $499 aftermarket charge as part of the total amount financed to purchase the truck, without disclosing the added charge. *Id*. at 278. What's more, the dealership never provided the aftermarket product for which it had charged the buyer. (*Id*. at 285) The *Gibson* Court concluded that the dealership's failure to provide the undisclosed aftermarket product represented a violation of TILA's requirement that the amount financed "shall be the amount of credit of which the consumer has actual use." *Id*. (citing 15 U.S.C. § 1638(a)(2)(A)).

Here, there is no evidence that Singh told the Dealership Defendants that he did not want any of the Add-ons included with his car or that he did not receive the Add-ons included in his contract. Singh negotiated the base price of his car which included the Dealer Prep service and a

Protection Package consisting of mud flaps, trunk trays, and wheel locks. (Dkt. No. 71 at 47.) The evidence shows that Singh received those items. (*Id*. at 42–43.) Singh did not tell Dealership employees that he did not want these items—in fact, the evidence demonstrates that he negotiated a base price of the car to include them. (Dkt. No. 62 at 3–4, 71 at 47.) Unlike *Gibson*, where the dealership failed to itemize the unwanted added charge or even provide the product to the buyer, the Dealership Defendants in this case were not required to itemize or describe items that were agreed to as part of the total price of the car and that were provided.

For those reasons, the Court finds that Singh has not produced sufficient evidence to support his TILA claim, and GRANTS summary judgment to Dealership Defendants.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 53) is GRANTED. Defendant's motion to strike is GRANTED in part and DENIED in part. The Clerk is directed to STRIKE pages 2–22 of Docket Number 60.

DATED this 26th day of October, 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE